**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SPAC Recovery Co.,<br><br>                                        Debtor. | **FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 25-12109 (JPM) |

**MEMORANDUM OPINION AND ORDER GRANTING THE DEBTOR'S MOTION FOR POST-PETITION SECURED FINANCING**

*APPEARANCES:*

**CULLEN & DYKMAN LLP**
*Counsel for the Debtor*
One Battery Park Plaza, 34th Floor
New York, NY 10004
By:    Michelle McMahon
         Kyriaki Christodoulou
         Michael H. Traison
         Bonnie Lynn Pollack

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
*Counsel for FS Credit Opportunities Corp.*
51 West 52nd Street
New York, NY 10019
By:    Nicolas Poli
         Michael Trentin

**UNDERWOOD LAW FIRM, P.C.**
*Counsel for SPV Lit Fund, LLC*
500 S. Taylor, Suite 1200
Amarillo, TX 79101
By:    Samantha A. Espino

**JENNER & BLOCK LLP**
*Counsel for Nomura Securities International, Inc.*
1155 Avenue of the Americas
New York, NY
By:    Jenna E. Ross
         Douglas E. Spelfogel

**KELLEY DRYE & WARREN LLP**
*Counsel for SPV Lit Fund, LLC*
3 World Trade Ctr., 175 Greenwich St.
New York, NY 10007
By:    Maeghan J. Mcloughlin

**UNITED STATES TRUSTEE**
*Office of the United States Trustee, Region 2*
One Bowling Green, Room 534
New York, NY 10004
By:    Andrea Beth Schwartz

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Before the Court is the motion filed on October 6, 2025 (the "**Motion**") by SPAC Recovery

Co. (the "**Debtor**"), seeking authority under 11 U.S.C. §§ 363, 364(c)-(d) to: (A) obtain a $500,000

post-petition secured loan (the "**DIP Loan**") from SPV Lit Fund, LLC (the "**DIP Lender**"); (B)

grant the DIP Lender a perfected, first-priority priming lien on all assets of the Debtor (the "**DIP**

**Lien**"); and (C) modify the automatic stay as to the DIP Lender.  (Dkt. No. 9, ¶ 21).

On October 29, 2025, FS Credit Opportunities Corp. ("**FS Credit**") filed an objection (the

"**Objection**"), arguing that the Motion should be denied because the DIP Lender is an insider of

the Debtor and that the DIP Loan is a self-dealing transaction that serves "no legitimate bankruptcy

purpose" other than to fund the Debtor's "unfounded litigation against third parties."  (Dkt. No.

23, ¶¶ 1-3).  On October 30, 2025, Nomura Securities International, Inc. ("**Nomura**") filed a

joinder in support of the Objection (the "**Joinder**").  (Dkt. No. 26).

On November 21, 2025, the Debtor filed a response (the "**Response**") disputing the claim

that the DIP Lender is an insider of the Debtor and asserting that the DIP Loan is the product of

"good faith, arms-length negotiations" and is in the "best interests of the Debtor's creditors and its

bankruptcy estate."  (Dkt. No. 45, ¶¶ 1, 3).  On the same day, the DIP Lender filed a reply (the

"**Reply**") in support of the DIP Motion and reiterating the Debtor's arguments.  (Dkt. No. 46).

A hearing on the Motion was held on November 25, 2025 (the "**Hearing**").  (Dkt. No. 47).

On December 5, 2025, the Debtor, the DIP Lender, and FS Credit each filed post-hearing

supplemental statements.  (Dkt. Nos. 51, 53 & 54).

The Court has reviewed all relevant filings, the arguments presented at the Hearing, and

the record as a whole.  For the reasons set forth below, the Motion is **GRANTED**.

## II.    <u>BACKGROUND</u>

### A.  THE FAILED ACQUISITION

The Debtor is a special purpose acquisition company ("**SPAC**") formed under Delaware law on September 11, 2018.  (Dkt. No. 9).  On December 23, 2020, the Debtor raised $139.4 million through an initial public offering ("**IPO**").  (*Id*. ¶ 5).  Under its articles of incorporation and the applicable rules of the Securities and Exchange Commission (the "**SEC**"), the Debtor had twelve months to complete the acquisition of a target company before it had to return the funds to the investors.  (*Id*.).  While the Debtor searched for an acquisition target, the IPO proceeds were held in an interest-bearing account (the "**SPAC Trust**") for the benefit of investors.  (*Id*.)

In July 2021, the Debtor identified North Atlantic Imports, LLC d/b/a Blackstone Products ("**Blackstone**") as a potential acquisition target.  (*Id*. ¶ 10).  In December 2021, the Debtor and Blackstone executed a Business Combination Agreement (the "**BCA**"), contingent on the Debtor securing sufficient funds to close the acquisition within the twelve-month period.  (*Id*.).  The Debtor retained Nomura as its investment banker, which brought in FS Credit and Oaktree Capital Management LP ("**Oaktree**") to finance the acquisition.  (*Id*. ¶ 11).

The Debtor failed to close the Blackstone acquisition before the deadline.  (Dkt. No. 23, ¶ 9).  As a result, the Debtor was required to redeem its public shares and return the IPO proceeds to its investors, leaving the Debtor with no ongoing business, employees, or assets.  (*Id*.)  The failed acquisition also triggered the Debtor's default on promissory notes payable to Blackstone totaling $785,000 that were issued to facilitate the acquisition.  (Dkt. No. 9, ¶ 14).

### B.  PENDING STATE LAWSUITS

On May 9, 2025, the Debtor sued Blackstone, FS Credit, Nomura, Oaktree, and other investment bankers and professionals in the New York County Supreme Court, seeking $53.7 million in compensatory damages and $537 million in punitive damages arising from the failed

acquisition (the "**New York Litigation**").   (*Id.* ¶ 12).   The Debtor alleges that these entities misappropriated the Debtor's "confidential information," in breach of their contractual and fiduciary duties, by using that information to "orchestrate an alternate transaction which excluded the Debtor." (*Id.* ¶ 11).  The case is currently pending.  *See* Verified Complaint, *SPAC Recovery Co. v. North Atlantic Imports, LLC, et al*., No. 652916-2025, 2025 WL 1699449 (N.Y. Sup. May 9, 2025).

In a separate civil action, Blackstone sued the Debtor in the New York County Supreme Court to enforce the delinquent promissory notes.  *See North Atlantic Imports, LLC v. SPAC Recovery Co*., No. 654852-2024, 2025 WL 1094653 (N.Y. Sup. Apr. 8, 2025).  On August 22, 2025, Blackstone obtained a judgment against the Debtor for $785,000 plus accrued interest and costs.  (Dkt. No. 9, ¶ 14).

Blackstone also filed suit in the Delaware Court of Chancery seeking to enforce the BCA's Delaware forum-selection clause and to enjoin the Debtor from litigating BCA-related claims in New York against Blackstone and its CEO.  (*Id.* ¶ 15).  On September 4, 2025, the court entered summary judgment for Blackstone (the "**Delaware Judgment**"), holding that the Debtor "has violated the BCA by bringing claims against Blackstone … arising out of the BCA in New York" and "permanently enjoined [the Debtor] from litigating [those] claims … in New York." *See North Atlantic Imports, LLC v. SPAC Recovery Co*., No. 2025-0824-KJSM, 2025 WL 2557012, at *1 (Del. Ch. Sept. 4, 2025).

To finance its lawsuits against Blackstone and related entities, in July 2024, the Debtor had entered into a Litigation Funding Agreement (the "**LFA**") with the DIP Lender, under which the DIP Lender agreed to provide up to $675,000, secured by a first-priority lien on all claim proceeds. (Dkt. No. 6, ¶ 14).  All members of the DIP Lender are shareholders of the Debtor.  (*Id.* ¶ 15).

4

## C. THE DEBTOR'S CHAPTER 11 CASE

On September 26, 2025, the Debtor filed a voluntary Chapter 11 petition in this Court. (Dkt. No. 1). According to the Debtor's Statement of Financial Affairs, Jason Roth ("**Mr. Roth**") serves as both the Debtor's CEO and its sole director; additionally, Mr. Roth holds 12.4% equity ownership as an "indirect shareholder." (*Id.*, Form 207 Question 28). Under the LFA, Mr. Roth is entitled to 10% of the net litigation proceeds, capped at $2 million. (Dkt. No. 6, ¶ 38). The Debtor lists the DIP Lender as its sole pre-petition secured creditor. (Dkt. No. 1, Form 206D). As of the petition date, the Debtor has drawn $560,030 from the DIP Lender under the LFA. (*Id.*)

The value of the Debtor's assets is disputed. In its schedules, the Debtor represents that its only significant asset is the $53.7 million claim asserted against Blackstone and related entities in the New York Litigation. (Dkt. No. 1, Form 206A/B Question 74). FS Credit contends that this claim is worthless because claims against Blackstone are barred by the Delaware Judgment and claims against other entities are time-barred under New York law. (Dkt. No. 23, ¶¶ 13, 15).

The value of unsecured claims is also disputed. The Debtor lists FS Credit and Nomura as unsecured creditors but reports their claims at $0. (Dkt. No. 1, Form 206E/F). FS Credit and Nomura assert that they are "among the Debtor's largest unsecured creditors by virtue of indemnification claims arising from their involvement in the failed SPAC transaction," but neither has identified a specific claim amount. (Dkt. No. 9, ¶ 12). Of the $8,909,740 in unsecured claims that the Debtor has scheduled, the Debtor disputes $7,332,343. (Dkt. No. 23 ¶ 19; Dkt. No. 1 Schedule E/F).

On the petition date, the Debtor also executed a Senior Secured Debtor-In-Possession Loan and Security Agreement (the "**DIP Agreement**") with the DIP Lender to provide additional litigation financing for the New York Litigation. (Dkt. No. 9, Exhibit B (preamble)). Under the DIP Agreement, the DIP Lender will extend a $500,000 post-petition loan, bearing 10% interest

per annum (20% upon default), secured by a first-priority lien on "all present and after acquired property of the Debtor." (*Id*. Exhibit B § 2e). The DIP Agreement defines, among other events, the removal of Mr. Roth as CEO and chairman of the board or the removal of Steven Cannon ("**Mr. Cannon**") as consultant as an "Event of Default." (*Id*. Exhibit B §§ 7, 8).

### D.  THE PARTIES' ARGUMENTS

On October 6, 2025, the Debtor filed the instant Motion. (Dkt. No. 9). The Motion seeks entry of an order authorizing the DIP Agreement under 11 U.S.C. §§ 363(f) and 364(c)-(d), Rules 2022, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 4001-2(a). (Dkt. No. 9, ¶ 21). The Debtor argues that the DIP Loan is "necessary to fund [its] Chapter 11 case" because the damages from the New York Litigation are "the only significant source of recovery for its creditors," and that the Debtor's board of directors "exercised sound business judgment" in executing the DIP Agreement. (*Id*. ¶¶ 18, 20).

FS Credit objects, arguing that the Debtor has not shown that the DIP Loan is in the best interest of the creditors or the estate. (Dkt. Nos. 23, 26). Specifically, FS Credit claims that: (i) the DIP Loan is "tainted by [insider] self-interest" because the DIP Lender is "wholly owned by the Debtor's shareholders … with no independent fiduciary to vet [its] terms" (Dkt. No. 23 ¶ 35); (ii) the DIP Loan serves no valid reorganizational purpose other than to fund insiders' litigation against third parties—including FS Credit and some of "the Debtor's largest unsecured creditors"—arising from the failed acquisition (*Id*. ¶ 12); (iii) the Debtor has failed to proffer evidence that the transaction was either "fair" to creditors or that "alternative financing [was] unavailable" (*Id*. ¶ 36); and (iv) the DIP Agreement "improperly allows shareholders to convert … equity contributions into superpriority debt" while granting them "total control over the litigation and case administration to the detriment of the estate's real creditors." (*Id*. ¶ 47).

## III.    <u>LEGAL STANDARD</u>

Section 364 of the Bankruptcy Code governs post-petition DIP financing.  Under 11 U.S.C.

§§ 364(c) and (d), a court may authorize the debtor to obtain credit on a first-priority, priming basis

only if the debtor cannot obtain such credit on more favorable terms from sources other than the

DIP lenders and, additionally, either:

    (i)      for unsecured credit, the debtor is "unable to obtain … credit allowable under section 503(b)(1) … as an administrative expense[;]" § 364(c)(1), or

    (ii)     for secured credit, the debtor is unable to obtain alternative financing and "the primed lienholder is adequately protected."  § 364(d).

*See In re Great Atlantic & Pacific Tea Company, Inc*., 2012 WL 13330777, at *7 (Bankr. S.D.N.Y.

Oct. 18, 2012); *see also In re Metaldyne Corp*., 2009 WL 2883045, at *2 (Bankr. S.D.N.Y. June

23, 2009).  The debtor bears the burden of demonstrating that alternative credit is unavailable.  *See*

*In re Roamer Linen Supply, Inc*., 30 B.R. 932, 935 (Bankr. S.D.N.Y. 1983).

Ordinarily, "in evaluating the merits of a proposed post-petition financing, courts will defer

to a debtor's business judgment provided that the financing does not unduly benefit a party in

interest at the expense of the estate." *In re Latam Airlines Group S.A*., 620 B.R. 722, 768 (Bankr.

S.D.N.Y. 2020); *see also In re Ames Department Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

(holding that "the court's discretion under [§] 364 is to be utilized on grounds that permit

reasonable business judgment to be exercised so long as the financing agreement does not contain

terms that leverage the bankruptcy process … or its purpose is not so much to benefit the estate as

it is to benefit a party-in-interest.").  The business judgment rule "is a presumption that in making

a business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." *In re Integrated*

*Resources, Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992).

However, "[t]he business judgment rule is not applicable to transactions [between] a debtor and an insider of the debtor." *In re Wythe Berry Fee Owner LLC*, 2024 WL 2767121, at *17 (Bankr. S.D.N.Y. May 29, 2024). Rather, "courts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction [between] a debtor and an insider of the debtor." *In re LATAM Airlines Group S.A.*, 2022 WL 272167, at *14 (Bankr. S.D.N.Y. Jan. 28, 2022). When applying heightened scrutiny, "courts are concerned with the integrity and *entire fairness* of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (emphasis added).

## IV.    ANALYSIS

### A.   GOVERNING FIDUCIARY PRINCIPLES FOR § 364 REVIEW

Before evaluating whether the proposed DIP transaction warrants deference under the business judgment rule, the Court must first clarify the fiduciary standards that inform § 364 review. In evaluating DIP financings under § 364, bankruptcy courts generally look to the fiduciary principles governing corporate directors and managers in the debtor's state of incorporation—often under Delaware law.[1] *See, e.g., In re Adelphia Communications Corp.*, 323

---

[1]    In bankruptcy cases, federal courts are not bound by *Erie* to apply state corporate law as they would in diversity jurisdiction cases. *See In re Johns-Manville Corp.*, 36 B.R. 743, 750 n.4 (Bankr. S.D.N.Y. 1984) ("Although bankruptcy courts have looked to state law for guidance, … bankruptcy courts are federal courts with original and exclusive jurisdiction over bankruptcy cases … and are thus not inalienably bound to enforce state law."); *cf. Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."). Nevertheless, because court approval of transactions under 11 U.S.C. §§ 363-365 frequently entails review of a debtor's business decisions, courts have imported state corporate fiduciary principles by analogy. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (holding that "Delaware business judgment rule principles" from *Smith v. Van Gorkom*, 488 A.2d 868 (Del. 1985) and *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) "have vitality by analogy in Chapter 11, especially where, as here, the debtor … is a Delaware [c]orporation.") (internal citation omitted).

Courts outside the Second Circuit have also followed *Integrated Resources* and looked to the fiduciary principles of the debtor's state of incorporation when reviewing transactions under §§ 363-365. *See, e.g., In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 104 (Bankr. D. Mass. 2013); *In re Caribbean Petroleum Corp.*, 444 B.R. 263, 269 (Bankr. D. Del. 2010); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2013); *In re Mattress Discounters Corp.*, 2008 WL 4542989, at *5 (Bankr. D. Md. Oct. 10,

B.R. 345, 384-85 (Bankr. S.D.N.Y. 2005) (applying Delaware law and holding that when "directors considering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the 'business judgment' rule."); *In re Signature Apparel Group LLC*, 577 B.R. 54, 101 (Bankr. S.D.N.Y. 2017) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)); *In re Fleming Packaging Corp.*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006) (citing *Cede & Co.*, 634 A.2d at 361); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005) (applying the Delaware business judgment rule to § 364(c) financing).  Although bankruptcy courts exercise federal jurisdiction and are not compelled to apply state corporate law in the same manner as courts sitting in diversity, they routinely import state-law fiduciary principles because approval of transactions under § 364 often entails scrutiny of managerial decision-making.  *See Integrated Resources*, 147 B.R. at 656.

Ordinarily, directors of a solvent corporation owe fiduciary duties to shareholders, not creditors.  *See C3 Media & Marketing Grp. LLC v. Firstgate Internet, Inc*., 419 F.Supp.2d 419, 431 (S.D.N.Y. 2005) ("An officer or director does not owe a fiduciary duty to the creditors of a solvent corporation").  However, "[o]nce a corporation becomes insolvent," those fiduciary duties "extend to the creditors" as well.  *In re I Successor Corp.*, 321 B.R. 640, 659 (Bankr. S.D.N.Y. 2005); *see also In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 230 (S.D.N.Y. 2016).  Specifically, the debtor's management owes a "duty to preserve the assets of the corporation for the benefit of creditors."  *Hughes v. BCI Intern. Holdings, Inc*., 452 F.Supp.2d 290, 308 (S.D.N.Y. 2006) (citing

---

2008); *Ryan, Inc. v. Circuit City Stores, Inc*., 2010 WL 4735821, at *3 (E.D. Va. Nov. 15, 2010); *In re Bouchard Transportation Co*., 74 F.4th 743, 750 (5th Cir. 2023); *In re ASARCO LLC*, 441 B.R. 813, 828 (S.D. Tex. 2010); *In re JW Resources, Inc*., 534 B.R. 193, 197 (Bankr. E.D. Ky. 2015); *In re Tiara Motorcoach Corp*., 212 B.R. 133, 137 (N.D. Ind. 1997); *In re Brook Valley VII*, 496 F.3d 892, 900 (8th Cir. 2007); *In re Station Casinos, Inc*., 2009 WL 8519660, at *4 (Bankr. D. Nev. July 28, 2009); *In re Twenver, Inc*., 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *In re Wildwood Villages, LLC*, 2021 WL 1784074, at *3 n.17 (Bankr. M.D. Fla. Feb. 22, 2021).  Some courts have even applied Delaware business judgment rule where the debtor is not a Delaware corporation.  *See, e.g., In re H2D Motorcycle Ventures, LLC*, 617 B.R. 625, 629 (Bankr. E.D. Wis. 2020) (applying Delaware fiduciary principles to evaluate a § 363 sale even though the debtor was a Wisconsin corporation).

*Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981)); *see also In re Chief Executive Officers Clubs, Inc*., 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) ("A debtor's officers, directors and managing employees owe the same fiduciary obligation to creditors and shareholders as would the trustee to the creditors of the estate."). That duty includes "the obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." *In re Hampton Hotel Investors, L.P*., 270 B.R. 346, 362 (Bankr. S.D.N.Y. 2001).

The Debtor's status as a SPAC does not alter these fiduciary duties. Delaware courts have consistently held that a SPAC's directors owe the same duties of care and loyalty as directors of any Delaware corporation. *See, e.g*., *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 712 (Del. Ch. 2023) ("The duties owed by the fiduciaries of a SPAC organized as a Delaware corporation are no different."); *In re Hennessy Capital Acquisition Corp. IV Stockholder Litigation*, 318 A.3d 306, 321 (Del. Ch. 2024) (reviewing a de-SPAC merger under the entire fairness standard where the SPAC's directors breached the fiduciary duty of loyalty by impairing the stockholder's redemption rights). Thus, this Court evaluates the conduct of SPAC fiduciaries under the established Delaware fiduciary framework—that is, whether the decision-makers were disinterested and acted on an informed basis and in good faith. *See Integrated Resources*, 147 B.R. at 656; *see also In re Residential Capital, LLC*, 491 B.R. 63, 70 (Bankr. S.D.N.Y. 2013) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

When the business judgment rule applies, "the proposed exercise of a debtor's business judgment" is presumed valid; the objecting party bears "the burden of rebutting [that] presumption." *In re Genco Shipping & Trading Limited*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014); *see also In re Trinsum Group, Inc*., 466 B.R. 596, 614 (Bankr. S.D.N.Y. 2012). To rebut

10

that presumption, the objecting party need only show "bad faith, self-interest, or gross negligence." *In re 8 West 58th Street Hospitality, LLC*, 2017 WL 3575856, at *3 (Bankr. S.D.N.Y. Aug. 4, 2017); *cf. Integrated Resources*, 147 B.R. at 656 (noting that some courts also permit an objecting party to rebut the business judgment presumption by showing "waste of corporate assets").

### B.  WHETHER THE BUSINESS JUDGMENT RULE APPLIES

The next question presented in the Motion is whether the business judgment rule applies to the proposed DIP transaction.  FS Credit argues that the proposed DIP Loan is tainted by self-dealing and therefore not entitled to judicial deference under the business judgment rule.  (Dkt. No. 23, ¶¶ 1-3).  In particular, FS Credit claims that the DIP Lender is an "insider" since its members consist "exclusively" of the Debtor's officers and shareholders.  (Dkt. No. 23, ¶ 21; Dkt. No. 54, ¶ 7).  The Debtor responds that the DIP Lender is not an "insider" because: (1) the DIP Lender does not control the Debtor's voting stock, business operations, or decision-making; and (2) the Debtor's sole director and CEO, Mr. Roth, has no ownership interest in the DIP Lender. (Dkt. No. 45, ¶¶ 7-8).

Section 101(31)(B) defines an "insider," for a corporate debtor, to include:

(i)     a director of the debtor;
(ii)    an officer of the debtor;
(iii)   a person in control of the debtor;
(iv)    a partnership in which the debtor is a general partner;
(v)     a general partner of the debtor; or
(vi)    a relative of a general partner, director, officer or person in control of the debtor.

11 U.S.C. §§ 101(31)(B)(i)-(vi).  Individuals and entities within these six enumerated categories are commonly referred to as "statutory insiders."  Congress, however, did not limit "insider" status to that statutory list.  *See In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Courts retain discretion to recognize "non-statutory insiders" based on the facts and circumstances of each case.  *See, e.g.*, *In re Friedman*, 126 B.R. 63, 69-71 (B.A.P. 9th Cir. 1991); *In re Standard*

*Stores, Inc.*, 124 B.R. 318, 324 (Bankr. C.D. Cal. 1991); *In re Badger Freightways, Inc.*, 106 B.R.

971, 980 (Bankr. N.D. Ill. 1989). "Whether or not an individual or entity will qualify as an insider

is a question of fact" that must be analyzed "on a case-by-case basis." *Tarricone*, 286 B.R. at 262-

63 (citing 2 COLLIER ON BANKRUPTCY ¶ 101.31); *see also In re Chas. P. Young Co.*, 145 B.R. 131,

136 (Bankr. S.D.N.Y. 1992)).

To determine "non-statutory insider" status, courts generally consider: (1) "the closeness

of the relationship between the debtor and the transferee"; and (2) "whether the transactions

between the transferee and the debtor were conducted at arm's length." *Tarricone*, 286 B.R. at

262 (citing *In re Emerson*, 235 B.R. 702, 707 (Bankr. D.N.H. 1999)). A transaction is at "arm's

length" when it is "conducted as though the two parties were strangers." *U.S. Bank Nat. Ass'n ex

rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 397 (2018)

(citing BLACK'S LAW DICTIONARY 1726 (10th ed. 2014)).

Here, the Court agrees with FS Credit that the record is sufficient to establish the DIP

Lender's insider status. According to witness testimony at the November 25, 2025 Hearing—as

summarized in FS Credit's Supplemental Statement—the DIP Lender's members are exclusively

Debtor shareholders who, in the aggregate, own roughly 25.6% of the Debtor:

> The DIP Lender's members are exclusively Debtor shareholders, and together own
> roughly 25.6% of the Debtor. DIP Hr'g Tr. at 20:6-20:25. Steve Cannon indirectly
> owns 12.4% through SPAC Partners-Ackrell LLC, the Debtor's largest equity
> holder (39.1%), and its managing member. *Id.* at 21:16-22:4. Mr. Cannon has been
> a consultant "since the beginning," was "integral to the business," helped prepare
> the Debtor's schedules, and is a substantial funder of the DIP. *Id.* at 25:2-26:10,
> 27:2-27:12. He also participated in negotiating DIP terms on behalf of the DIP
> Lender, *id.* at 24:5-13, and the DIP makes his removal an event of default absent a
> replacement acceptable to the DIP [L]ender within seven days. *Id.* at 27:13-27:24;
> DIP Agreement § 7(a)(xv). The overlap extends to Long Long, a former Debtor
> officer who helped prepare the Debtor's schedules and is also a DIP Lender member
> who committed $100,000 toward the DIP. DIP Hr'g Tr. at 28:15-29:2. Dyke
> Rogers, who also negotiated the DIP Loan, is a shareholder of the Debtor as well.
> *Id.* at 24:5-24:7, 29:3-29:5.

(Dkt. No. 54 ¶ 7; Dkt. No. 47). Given that the DIP Lender's members include officers and principal shareholders of the Debtor, those individuals are "statutory insiders" within the meaning of § 101(31)(B)(i)-(ii). And because "a corporation only acts through its agents," their insider knowledge and conduct are imputed to the entity. *See In re Granite Partners, L.P.*, 194 B.R. 318, 330 (Bankr. S.D.N.Y. 1996) ("[T]he law imputes to the corporation the knowledge and conduct of the guilty insider; a corporation only acts through its agents[.]"); *see also In re Lehr Construction Corp.*, 551 B.R. 732, 738 (S.D.N.Y. 2016) ("[A]cts of agents, and the knowledge they acquire while acting within the scope of their authority[,]" are "imputed to their principals."). Thus, despite that Mr. Roth is not a member or owner of the DIP Lender, the insider status of other officers and significant shareholders supports treating the DIP Lender as an insider for the purposes of this Motion.

Even if the DIP Lender does not qualify as a "statutory insider," the record supports a finding of "non-statutory insider" status under *Tarricone*. The relationship between the Debtor and the DIP Lender is unusually close, given the substantial overlap in ownership and management. (Dkt. No. 54 ¶ 7). FS Credit also alleges facts supporting a reasonable inference that the DIP terms were not negotiated as if the parties were strangers. For example, §§ 7 and 8 of the DIP Agreement designate as "Events of Default" the removal of Mr. Roth (the Debtor's CEO and chairman of the board) and Mr. Cannon (the Debtor's long-term consultant). (Dkt. No. 9, Exhibit B §§ 7, 8). In addition, key managers, including Mr. Roth, have direct pecuniary interests in litigation proceeds funded by the DIP Loan (Mr. Roth is entitled to 10% of net recoveries, capped at $2 million, *see* Dkt. No. 6, ¶ 38), and other officers personally contributed funds to the DIP. (Dkt. No. 54 ¶ 7). These facts—coupled with overlapping negotiators on both sides and the

13

existence of a protective-default provision—indicate that the DIP Loan was not negotiated at arm's length.

To the extent that the DIP Lender argues that it is not an insider because it does not exercise "control" over the Debtors' voting or operations, the Court is unpersuaded. (Dkt. No. 45, ¶¶ 7-8). "Control" is not necessary for a finding of insider status. *See In re Endo International Plc*, 2025 WL 2807873, at *30 (Bankr. S.D.N.Y. Sept. 29, 2025). "Where Congress intended control to be an element in determining insider status, it was specified in the statute." *Tarricone*, 286 B.R. at 264. For "statutory insiders," only §§ 101(31)(B)(iii) and (vi) expressly require "a person in control." *See* 11 U.S.C. §§ 101(31)(B). Corporate directors and officers are "statutory insiders" under §§ 101(31)(B)(i)-(ii) regardless of control. *See id.* For "non-statutory insiders," the core inquiry is "whether there is a close relationship between [the] debtor and [the] third party" and "anything other than closeness to suggest that any transactions were not conducted at arm's length." *In re PHS Grp. Inc*., 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018). Whether the individual exercised actual control is irrelevant. *See id*.

## C.  WHETHER THE DIP LOAN SURVIVES ENTIRE FAIRNESS SCRUTINY

Having found that the DIP Lender is an "insider," the Court concludes that business judgment deference does not apply. The proposed DIP transaction must therefore withstand entire fairness review—the "most onerous standard" under Delaware law—which requires proof that "the transaction was the product of both fair dealing and fair price." *In re Transcare Corporation*, 2020 WL 8021060, at *19 (Bankr. S.D.N.Y. July 6, 2020) (quoting *In re Opus E., LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 Fed. Appx. 711 (3d Cir. 2017)). The burden rests on the conflicted fiduciaries—here, the Debtor and the DIP Lender—to demonstrate that the transaction as a whole is "objectively fair" on both procedural and substantive grounds. *See id.* ("[C]ourts look at the entirety of the transaction in

14

determining fairness."); *see also Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("[A] director who stands on both sides of a transaction … has the burden of establishing its entire fairness[.]").

      **(i)     Fair Dealing**

      Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors … were obtained." *Transcare*, 2020 WL 8021060, at *19 (quoting *Weinberger*, 457 A.2d at 711). "The cornerstone of fair dealing is a process implemented by the board that reflects arms' length bargaining and provides protections for the interests of all [creditors]." *Id.* (citing *FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *26 (Del. Ch. Mar. 11, 2019)). Although directors are not required to establish an independent committee to negotiate the transaction, the absence of meaningful procedural protections weighs against a finding of fairness. *See Pereira v. Cogan*, 267 B.R. 500, 509 (S.D.N.Y. 2001) (quoting *Weinberger*, 457 A.2d at 709-10 n.7) ("[Fair] procedures generally include an independent special committee formed to assess and negotiate the transaction; however, where there is no independent committee, fairness 'can be equated to conduct by a theoretical, wholly independent, board of directors.'"); *see also Reis*, 28 A.3d at 464 ("There was no dealing in this case that could be called 'fair.' Procedural protections were not implemented, and no one bargained for the minority."). The directors' "own evaluation of their innocence of wrongdoing and on the fairness of [the transaction] is insufficient to prove fair dealing." *Pereira*, 267 B.R. at 509 (quoting *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986)).

FS Credit argues that the Debtor cannot show fair dealing because "there is no record evidence of any marketing process." (Dkt. No. 54, ¶ 10). FS Credit claims that, despite the Debtor's references to having explored alternative funding and having consulted a litigation-funding advisor, "the Debtor has not identified: (1) which potential lenders were contacted, (2) what terms were offered by third parties, (3) why those alternatives were rejected, or (4) how the proposed terms compare to market rates for litigation funding." (Dkt. No. 23, ¶ 37). FS Credit further argues that the Debtor ignored the "most obvious alternative" of an equity contribution by existing shareholders and has not justified granting superpriority priming liens to insiders to finance their litigation. (*Id*. ¶ 38).

In response, the Debtor contends that the transaction was procedurally fair because it was negotiated at arm's length. The Debtor notes that its CEO and sole director, Mr. Roth, has no ownership interest in the DIP Lender; that the DIP Lender's manager, Mr. Dyke Rogers, made lender-side decisions after consulting separate counsel; and that both sides acted with the advice of separate counsel. (Dkt. No. 45, ¶¶ 12-13).

As the Court has already observed, the Debtor has not established arm's length bargaining given the DIP Lender's "insider" status. Nonetheless, the Court finds that the Debtor has sufficiently shown fair dealing. Although Delaware law recognizes that arm's length bargaining is strong evidence of fair dealing, the absence of such does not, by itself, render a conflicted transaction procedurally unfair. *See Wilen v. Pollution Control Industries, Inc*., 1984 WL 8272, at *3 (Del. Ch. Oct. 15, 1984); *see also Joseph v. Shell Oil Co*., 482 A.2d 335, 343 (Del. Ch. 1984) ("[F]ailure to arrive at the price by arms-length negotiations does not ipso facto indicate … unfair [dealing]. It is but one factor to be considered."). What is "fair" depends on "all aspects of the

entire transaction," viewed in light of the particular facts and circumstances of each case. *In re Southern Peru Cooper Corp. Shareholder Derivative Litigation*, 52 A.3d 761, 788 (Del. Ch. 2011).

Here, several features of the transaction process weigh in favor of the finding that there was fair dealing:

*First*, the Debtor has sufficiently demonstrated that no reasonable third-party funding alternatives were available given the absence of a true "market" for the Debtor's asset. The Debtor's principal asset is its litigation claim—valued by the Debtor at approximately $53.7 million—against Blackstone and other entities, and the sole objective of the DIP transaction is to finance that litigation. (Dkt. No. 1, Form 206A/B Question 74). Litigation claims are not necessarily fungible, liquid assets. Their pricing, control rights, covenants, and collateralization are all bespoke and case specific. *See Mills v. Capital One, N.A.*, 2015 WL 5730008, at *17 (S.D.N.Y. Sept. 30, 2015) ("There can be no question that lawsuits are not fungible goods, and any experienced litigator will attest that the time and effort necessary to litigate a claim successfully is not necessarily proportional to the amount in issue."). In this regard, demanding the Debtor to solicit competing bids in open markets is of limited utility and, in many instances, impracticable. Thus, FS Credit's insistence on an auction-style market process, while sensible for DIP financings in many contexts, is ill-suited to a litigation financing facility of the type presented here.

*Second*, the record reflects that the Debtor has provided procedural safeguards that are adequate under the circumstances. This is not a "melting ice cube" case in which speedy resolution and market exposure are necessary to preserve estate value. The Debtor's asset is unique and, as a practical matter, not readily marketable because it consists exclusively of litigation claims. Against that backdrop, the Debtor was not required to replicate the full panoply of auction-style protections typically used to solicit competitive market bids. Here, both the Debtor and the DIP

17

Lender were represented by separate counsel and decision-makers. (Dkt. No. 45, ¶¶ 12-13). The material terms of the DIP Agreement—including the protective-default provisions tied to certain insiders—were fully disclosed to the creditors and parties-in-interest. And those parties were afforded meaningful opportunity to object. Nothing in the record suggests that FS Credit or any other party-in-interest was excluded from the process or deprived of a chance to be heard.

*Third*, the record indicates that the Debtor reasonably considered alternatives and acquired funding on reasonable terms. FS Credit's contention that the Debtor should have pursued post-petition equity contributions or unsecured credit does not negate fair dealing. (Dkt. No. 23, ¶ 38). The parties cite no authority that bars pre-petition shareholders from providing post-petition secured financing. Nor does the governing case law necessarily require subordination of the lender's claims when certain members of the DIP Lender also hold equity ownership positions. *See In re Shelter Enterprises, Inc.*, 98 B.R. 224, 231 (Bankr. W.D. Pa. 1989) (holding that a creditor's equity ownership amounting to a controlling interest in the debtor does not, standing alone, require equitable subordination of that creditor's claims); *see also In re Astroline Communications Co.*, 226 B.R. 324, 329 (Bankr. D. Conn. 1998) ("[T]he mere fact of an insider relationship is insufficient to warrant [equitable] subordination.") (internal citations omitted). The key inquiry is not whether some hypothetical alternative might have been "better" in the abstract, but whether the Debtor adopted a reasonable, good-faith process to obtain financing that was realistically obtainable and justified under the circumstances. *See Crispo v. Musk*, 304 A.3d 567, 577 (Del. Ch. 2023) ("[A] board has the obligation to undertake a logically sound process to get the best deal that was *realistically* attainable.") (emphasis added).

To be sure, certain provisions of the DIP Agreement—such as default triggers tied to the removal of specified insiders—reflect self-serving features that one would not necessarily find in

a robust, competitive market deal. Those features cut against the Debtor's assertion of arm's length bargaining. But entire fairness does not demand perfection; it requires only a procedurally fair negotiation process that is commensurate with the particular facts of the case. Thus, considering the nature of the Debtor's asset, the existence of minimum procedural safeguards, and the practical limits on "marketing" litigation funding, the Court concludes that the Debtor has carried its burden to demonstrate fair dealing.

### (ii)    Fair Price

Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company[.]" *Transcare*, 2020 WL 8021060, at *19 (quoting *Weinberger*, 457 A.2d at 711). "The fair price analysis 'is not itself a remedial calculation' but a determination of whether the price 'fell within a range of fairness.'" *Id*. (quoting *Reis*, 28 A.3d at 465); *see also Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, at *36 (Del. Ch. July 6, 2018) ("[T]he court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness."). In determining whether a price was fair, courts consider "whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'" *Transcare*, 2020 WL 8021060, at *19 (quoting *Cinerama, Inc. v. Technicolor, Inc*., 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

FS Credit argues that the pricing was substantively unfair because there is "no evidence of arms' length market testing or benchmarking against comparable litigation funding." (Dkt. No. 23, ¶ 34). It also argues that the DIP transaction confers "priming and superpriority [rights] over the estate's sole asset while embedding extensive control provisions for shareholders." (*Id*.)

19

However, FS Credit overstates what entire fairness review requires and overlooks the realities of litigation financing in Chapter 11.

While the factual circumstance of this case is unusual, it is not unprecedented.  Courts have approved litigation-funding DIP facilities—sometimes from insider lenders—where the debtor's principal asset is a litigation claim and granted liens on priming or superpriority basis.  *See, e.g.*, *In re FastShip, Inc.*, Case No. 12-10968 (Bankr. D. Del. Apr. 23, 2012) (Dkt. No. 63) (final order approving a $400,000 post-petition loan secured by superpriority and priming liens to fund prosecution of the estate's claims where non-litigation assets were de minimis); *In re The SCO Group, Inc.*, Case No. 07-11337 (Bankr. D. Del. Mar. 5, 2010) (Dkt. No. 1084) (approving a $2 million insider-provided post-petition facility over the creditor's objection to fund case administration and litigation, with superpriority liens and protective covenants); *In re LP&D, Inc.*, Case No. 12-14894 (Bankr. D. Mass. Jan. 23, 2015) (Dkt. No. 172) (approving financing to prosecute the estate's sole significant adversary proceeding and granting superpriority liens, notwithstanding objections premised on control and repayment risk).

Measured against that backdrop and the present record, the Court finds that the proposed terms of the DIP Agreement fall within a fair range.  The facility is relatively modest in size— $500,000—compared to the Debtor's asserted claim value of approximately $53.7 million.  (Dkt. No. 1, Form 206A/B Question 74).  The financing is tailored to preserve and prosecute the estate's principal asset.  Without it, the claims would languish and likely lose value.  The priming and superpriority features are calibrated to the practical reality that repayment depends on litigation recoveries and that the DIP Lender bears significant non-diversifiable financial risk.  Such protections are common in litigation-funding facilities and, on this record, not disproportionate to the risk undertaken.  While the protective-default provision protecting insiders from removal may

20

be atypical in a competitive DIP facility, that provision does not by itself render the transaction unfair—especially where, as here, the DIP facility is narrow in scope, fully disclosed, and directed at value preservation rather than asset transfer.

To the extent that FS Credit claims that the transaction is substantively unfair because it lacks "market" comparables, the Court is unpersuaded.  (Dkt. No. 23, ¶ 34).  The absence of conventional market testing does not transform a bespoke, high-risk litigation-funding price into an unfair one.  *See Joseph*, 482 A.2d at 343 ("[F]ailure to arrive at the price by arms-length negotiations does not ipso facto indicate an unfair price.").  The record supports a finding that the price here is within a range that a reasonable seller could accept.  *See Transcare*, 2020 WL 8021060, at *19.  Moreover, given the nature of litigation financing, the Court agrees with the Debtor that there were no "cheaper" alternatives that were realistically attainable.

Taking the transaction as a whole, the size of the loan relative to the potential upside to the Debtor and the estate, and the necessity of funding to preserve the estate's sole asset, the Court finds that the DIP Agreement is substantively fair.  Accordingly, the fair price component of entire fairness review is satisfied.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Motion is **GRANTED**.

**IT IS SO ORDERED**.


Dated: January 2, 2026
       New York, New York

                                    /s/ John P. Mastando III
                                    HONORABLE JOHN P. MASTANDO III
                                    UNITED STATES BANKRUPTCY JUDGE