**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SPAC RECOVERY CO.,<br><br>Debtor. | **FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 25-12109 (JPM) |

***APPEARANCES*:**

**CULLEN & DYKMAN LLP**
*Former Counsel for the Debtor*
One Battery Park Plaza, 34th Floor
New York, NY 10004
By: Michelle McMahon

**UNDERWOOD LAW FIRM, P.C.**
*Counsel for the DIP Lender*
500 S. Taylor, Suite 1200
Amarillo, TX 79101
By: Michael S. Smiley

**UNITED STATES TRUSTEE**
*Office of the U.S. Trustee, Region 2*
One Bowling Green, Room 534
New York, NY 10004
By: Andrea B. Schwartz

# MEMORANDUM OPINION AND ORDER DIRECTING THE DIP LENDER TO DISBURSE FUNDS TOWARD THE PAYMENT OF CULLEN & DYKMAN LLP'S REQUESTED FEES AND EXPENSES

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I. INTRODUCTION

This dispute arises from the Chapter 11 case of SPAC Recovery Co. (the "**Debtor**"). Before the Court is the application (the "**Application**"), dated July 17, 2026, of the Debtor's former counsel Cullen & Dykman LLP ("**C&D**"), seeking entry of an order authorizing payment of final professional compensation for legal services rendered to the Debtor. (Dkt. No. 131). The Application seeks (i) interim allowance and payment of $63,085.50 in attorneys' fees and $2,309.41 in expenses incurred from May 1, 2026 through June 30, 2026; and (ii) final allowance of $521,752.50 in attorneys' fees and $4,153.66 in expenses incurred from September 26, 2025 through June 30, 2026. (*Id.* at 2-3, 6-7).

On August 12, 2026, SPV Lit Fund, LLC (the "**DIP Lender**") filed an objection (the "**Objection**"), arguing that it has no obligation under the Court-approved debtor-in-possession financing agreement (the "**DIP Agreement**") to fund payment of C&D's fees because the Debtor failed to satisfy certain conditions precedent and was in default under that agreement. (Dkt. No. 139). The DIP Lender further argues that, even if C&D is entitled to payment, C&D's recovery from the DIP Loan is limited to C&D's pro rata share of the professional fee carve-out as specified in the DIP Agreement. (*See* Objection, Dkt. No. 139, ¶¶ 28-37, 48-50).

On August 19, 2026, the Court held a hearing to consider the Application (the "**Hearing**"). That same day, the Court issued an order (the "**Fee App Order**") granting the Application in part and awarding C&D interim attorneys' fees and expenses in the amount of $65,394.91, and final fees and expenses in the amount of $525,906.16. (Dkt. No. 146). The Fee App Order resolved the amount of compensation to which C&D is entitled, but did not resolve the separate question of whether the DIP Lender is required to fund the payment of the attorneys' fees and expenses.

Having considered the parties' briefings on that issue, the arguments presented at the Hearing, and the record as a whole, the Court concludes that the DIP Lender is required to fulfill its funding obligations under the DIP Agreement toward payment of C&D's allowed fees and expenses. The DIP Agreement authorizes DIP proceeds to be used to pay allowed professional fees and establishes a separate Carve-Out Reserve. (*See* DIP Agreement §§ 2(b), 3(f), Dkt. No. 9, Ex. B). Separately, the DIP Agreement provides that the DIP Lender has "no recourse" to that reserve until all allowed Carve-Out expenses are paid. (*Id.* § 3(f)). The DIP Agreement further provides that the DIP Lender's liens and superpriority claims remain subject to the Carve-Out until all expenses allowed thereunder are paid in full. (*Id.* § 3(e)). Under the terms of the DIP Agreement, it appears that those protections survive an event of default. Thus, for the reasons explained below, the Court finds that C&D's allowed fees and expenses fall within the Carve-Out, and the Court orders the DIP Lender to disburse funds toward the payment of C&D's allowed fees and expenses.

## II. <u>BACKGROUND</u>

### A. The DIP Agreement

On September 26, 2025, the Debtor entered into the DIP Agreement, entitled "Senior Secured Debtor-in-Possession Loan and Security Agreement," with the DIP Lender. (*See* DIP Agreement, Dkt. No. 9, Ex. B). The DIP Agreement provides for a $500,000 post-petition secured credit facility to fund administration of this Chapter 11 case and prosecution of the Debtor's principal asset—the pending state-court litigation arising from the Debtor's failed acquisition of Blackstone Products. (*Id.* §§ 2(a)-(b); *see also* Dkt. No. 63 at 2, 20-21). The Court approved the DIP Agreement by Memorandum Opinion and Order dated January 2, 2026 (the "**DIP Order**"). (Dkt. No. 63). As the Court previously found, the DIP Lender is an insider of the Debtor, but the

post-petition financing transaction nevertheless satisfied "entire fairness" review under § 364. (*Id.* at 14-21).

As relevant to this dispute, the DIP Agreement specifically contemplates payment of retained professionals. The DIP Agreement defines "Professional Fees" as "all accrued and unpaid claims for reasonable fees[,] costs, disbursements, and expenses incurred by the Professional Persons to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural or otherwise." (*See* DIP Agreement § 1(g), Dkt. No. 9, Ex. B). The parties do not dispute that C&D falls within the definition of "Professional Persons" as a firm retained by the Debtor pursuant to § 327 of the Code. (*Id.* § 1(h)). Section 2(b) of the DIP Agreement, in turn, provides that the DIP Facility's proceeds may be used to "pay the reasonable Professional Fees of the Professional Persons." (*Id.* § 2(b)).

The DIP Agreement also establishes specific procedures for requesting payment of Professional Fees. Under sections 2(c) and 2(d), the Debtor must submit an "Advance Request" and, for funds held in the Lockbox Account, a "Disbursement Request" supported by the relevant documentation. (*Id.* §§ 2(c)(ii), 2(d)(ii)). The "Lockbox Account" is the deposit account into which each advance of DIP proceeds is deposited. (*Id.* §§ 1(f), 2(c)(v)). The DIP Lender must review each request within five days and "shall not unreasonably deny" a compliant request or refuse to fund the advance or disbursement. (*Id.* §§ 2(c)(iii)-(iv), 2(d)(iii)-(iv)). Once a Disbursement Request is approved, the DIP Lender must "cause such amount to be Disbursed from the Lockbox Account," including "directly to the person, entity, firm, partnership, or similar to which the fees, costs, or expenses described in the Disbursement Request are owed." (*Id.* § 2(d)(v)).

Those general funding provisions operate alongside a more specific set of protections for Professional Fees. Section 3(d) provides that the DIP Lender's liens and superpriority claims are "subject to and limited in priority by" the "Carve-Out," which includes "all Professional Fees incurred at any time on or prior to the first business day after the Trigger Date," as well as Professional Fees incurred thereafter up to an aggregate $100,000 "Post Carve-Out Cap." (*Id.* § 3(d)). The DIP Agreement defines the "Trigger Date" as "the date on which a Trigger Notice is given by the DIP Lender to the Trigger Notice Parties," and defines a "Trigger Notice" as "a written notice that the DIP Lender is invoking the Post Carve-Out Cap." (*Id.* §§ 1(i)-(j)). That same provision expressly states that "[n]othing in the DIP Agreement shall be construed as a cap or limitation on the amount of allowed Professional Fees that may be due and payable to Professional Persons." *Id.*

The DIP Agreement further provides that a Trigger Notice may be delivered only during the continuation of an Event of Default and in connection with termination of the DIP Lender's funding commitment. (*Id.* § 3(e)). The Trigger Notice must "describe the Event of Default" and "expressly state the Post Carve-Out Cap has been invoked." (*Id.*). Upon delivery of such Trigger Notice, "notwithstanding anything to the contrary in the DIP Documents," all DIP Obligations, DIP Liens, DIP Superpriority Claims, and other claims and liens of the DIP Lender "shall be subject and subordinate to the Carve-Out until all expenses allowed thereunder are repaid in full." (*Id.*).

Finally, the DIP Agreement requires the DIP Lender, as part of the initial funding of the facility and "without the need of an Advance Request," to set aside $125,000 in the Lockbox Account as the "Carve-Out Reserve." (*Id.* § 3(f)). The Carve-Out Reserve exists "for the sole benefit of funding the Carve-Out." (*Id.*). The DIP Agreement further provides that the DIP

Lender's liens and claims "shall not attach to the Carve-Out Reserve" and that the DIP Lender "shall have no recourse to the Carve-Out Reserve unless and until all allowed Carve-Out expenses have been fully paid." (*Id.*).

**B. The Parties' Positions**

The present dispute arose after C&D sought payment of fees that had been allowed on an interim basis. According to C&D, on May 21, 2026, the Debtor informed the DIP Lender that it intended to submit an Advance Request for approximately $180,000 to pay C&D. (*See* C&D Supplemental Statement, Dkt. No. 141, ¶ 4(a)). Before the formal request was submitted, however, the DIP Lender advised the Debtor that it would deny further funding and identified three alleged defaults under the DIP Agreement as grounds for denial. (*Id.*). C&D characterizes this as an "anticipatory denial" of payment and contends that the DIP Lender sought to rely upon circumstances caused, at least in part, by its own refusal to fund professional fees. (*See* C&D Supplemental Statement, Dkt. No. 141, ¶¶ 3-5).

On June 26, 2026, the Debtor nevertheless submitted formal Advance and Disbursement Requests seeking funds to pay C&D's allowed fees, together with supporting invoices. (*Id.* ¶ 4(c)). The DIP Lender denied those requests, relying upon previously asserted defaults as grounds for denial. (*Id.* ¶¶ 4(c), 6). C&D responded that those defaults were either inconsistent with the plain language of the DIP Agreement or "created by SPV," and therefore could not be relied upon by the DIP Lender in good faith to avoid its funding obligation. (*Id.* ¶¶ 4-6).

In the Objection, dated August 12, 2026, the DIP Lender takes the opposite position. The DIP Lender argues that the Debtor did not submit the relevant completed Advance and Disbursement Requests until June 26, 2026—after the DIP Lender had provided notice of default on May 27, 2026—and that, by that time, it "no longer had any obligation to approve the request

or to make any advance or disbursement under the DIP Loan." (*See* Objection, Dkt. No. 139, ¶ 31). The DIP Lender further argues that C&D is not a party to the DIP Agreement, lacks standing to challenge its terms, and thus may recover only against the Debtor or through its "pro rata share of the Carve-Out." (*Id*. ¶¶ 23, 35).

The DIP Lender separately argues that, even if C&D is entitled to payment from the DIP Facility's proceeds, that payment is limited by the Carve-Out. (*See id*. ¶¶ 48-50). According to the DIP Lender, the Carve-Out contains an "agreed upon ceiling" of $100,000, and permitting payment beyond C&D's pro rata share of that amount would "impermissibly re-write the DIP Loan after the fact." (*Id.*).

On August 17, 2026, C&D filed a reply arguing that the DIP Lender misreads the Carve-Out (the "**Reply**"). (Dkt. No. 143). C&D emphasizes that the $100,000 limitation applies only to fees incurred after the Trigger Date, while fees incurred before that date remain within the Carve-Out without regard to that cap. (*See* Reply, Dkt. No. 143, at 5-6). C&D also relies upon the DIP Agreement's express statement that "[n]othing in the DIP Agreement shall be construed as a cap or limitation on the amount of allowed Professional Fees that may be due and payable to Professional Persons." (*Id.*). C&D further notes that, even assuming the May 27, 2026 email constituted a Trigger Notice, it "makes no reference to such," and all of C&D's requested fees remain within the Carve-Out. (*Id*. at 6). Finally, C&D invokes § 105(a) of the Bankruptcy Code and asks the Court to enforce the DIP Order and the DIP Lender's obligations under the Court-approved DIP Agreement. (*See* C&D Supplemental Statement, Dkt. No. 141, at 7-8).

## III. LEGAL STANDARD

When a contract contains a valid choice-of-law clause, "the law selected in the clause dictates how the contract's provisions should be interpreted." *Stevens & Co. LLC v. Espat*, No.

24-CV-5223, 2025 WL 950989, at *5 (S.D.N.Y. Mar. 28, 2025) (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005)). Here, the DIP Agreement contains a choice-of-law clause providing that New York law governs the interpretation and enforcement of rights and remedies arising under the DIP Agreement. (*See* DIP Agreement § 10(g)). Absent a dispute concerning that clause's validity, New York law applies.

Under New York law, "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 729 n.15 (2d Cir. 2010) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002)). In construing a contract, the Court must read the contract as a whole and "give full meaning and effect to all of its provisions." *Georgia-Pac. Consumer Prods., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). "It is a cardinal rule of construction that the court adopt an interpretation that renders no portion of the contract meaningless." *Wallace v. 600 Partners Co.*, 618 N.Y.S.2d 298, 301 (N.Y. App. Div. 1st Dep't 1994).

Where a contractual obligation is subject to a condition precedent, the condition ordinarily must occur before the corresponding duty to perform arises. *See Prospect Cap. Corp. v. Credito Real USA Fin. LLC*, 702 F. Supp. 3d 178, 187 (S.D.N.Y. 2023); *see also Sohm v. Scholastic Inc.*, 959 F.3d 39, 46 (2d Cir. 2020) ("A condition precedent … is an act or event … which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises."). But "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of New York*, 28 N.Y.2d 101, 106 (N.Y. 1971); *see also*

*Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) (quoting *Kooleraire*, 28 N.Y.2d at 106) (explaining that, under New York law, "the doctrine of prevention stands for the general proposition that 'a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition'").

Separately, bankruptcy courts also possess equitable authority under § 105(a) to issue orders "necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). That authority does not permit a bankruptcy court to rewrite a financing agreement or alter substantive rights of the parties that the Court previously approved. *See In re 210 Roebling, LLC*, 336 B.R. 172, 176 (Bankr. E.D.N.Y. 2005) ("[W]hile a bankruptcy court's equitable powers under § 105(a) may be broad, they cannot be invoked to alter substantive rights under nonbankruptcy law, absent exceptional circumstances."). It does, however, permit the Court to enforce its own orders and the obligations imposed by a Court-approved post-petition financing agreement. *See In re River Center Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (holding that § 105(a) authorizes a bankruptcy court "to enforce and implement" earlier orders); *see also In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (enforcing a payment obligation arising from a court-approved post-petition financing agreement under § 105(a)).

## IV. <u>ANALYSIS</u>

### A. C&D's Requested Fees and Expenses Fall Within the DIP Agreement's Carve-Out

The threshold question is whether the fees and expenses sought by C&D constitute Professional Fees protected by the Carve-Out provision of the DIP Agreement. Here, neither party disputes that the DIP Agreement governs the parties' respective rights and obligations concerning the DIP Facility, and the DIP Agreement itself contains an integration clause. Section 10(f)

provides that the "DIP Agreement, the DIP Order, and other DIP Documents constitute the entire contract among the Parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written[.]" (*See* DIP Agreement § 10(f)). Because the DIP Agreement is fully integrated and the Court finds that the relevant provisions are facially unambiguous, the Court interprets those provisions "according to the plain meaning of [their] terms" and looks "within the four corners" of the DIP Agreement to ascertain the parties' intent. *Greenfield*, 98 N.Y.2d at 569 (applying the general principle that "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms"); *see also In re Aerovias Nacionales de Colombia, S.A. Avianca*, 323 B.R. 879, 887 (Bankr. S.D.N.Y. 2005) (quoting *Rainbow v. Swisher*, 72 N.Y.2d 106, 108 (N.Y. 1988)) ("Where a document is clear and unambiguous on its face, 'the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'"). Applying that principle, the Court finds that C&D's requested fees and expenses fall within the Carve-Out under the terms of the DIP Agreement.

The plain language of the DIP Agreement indicates that the attorneys' fees and expenses sought by C&D fall within the Carve-Out. C&D's fees and expenses constitute "Professional Fees" because C&D is a "Professional Person" retained under § 327 of the Bankruptcy Code and the amounts, to the extent allowed, constitute accrued fees and expenses incurred in its representation of the Debtor. (*See* DIP Agreement §§ 1(g)-(h)). Payment of those Professional Fees is also an expressly authorized use of DIP proceeds. (*Id.* § 2(b)). There is no dispute that, under ordinary circumstances, the fees and expenses sought by C&D are the type encompassed by the DIP Agreement's Carve-Out.

The parties, however, disagree as to whether C&D's total requested compensation of $525,906.16 is limited by the $100,000 Post Carve-Out Cap, which may be invoked through delivery of a valid Trigger Notice during the continuation of an Event of Default. (*See* DIP Agreement §§ 3(d)-(e)). The DIP Lender contends that the requested compensation exceeds the "agreed upon ceiling" established by the Carve-Out and that, once the DIP Lender declared an Event of Default and terminated its funding commitment, C&D's recovery became limited to its pro rata share of the $100,000 Post Carve-Out Cap. (*See* Objection, Dkt. No. 139, ¶¶ 48-50). C&D responds that the $100,000 limitation applies only to Professional Fees incurred after the first business day following delivery of a valid Trigger Notice, while Professional Fees incurred before that time remain within the Carve-Out without regard to that cap. (*See* Reply, Dkt. No. 143, at 5-6).

Reading the DIP Agreement as a whole, the Court finds that the $100,000 Post Carve-Out Cap does not limit the total compensation sought by C&D. Section 3(d) draws an express distinction between (i) Professional Fees incurred "on or prior to the first business day after the Trigger Date," which are included within the Carve-Out without a dollar limitation, and (ii) Professional Fees incurred thereafter, which are subject to the $100,000 Post Carve-Out Cap. (*Id.* § 3(d)). The DIP Lender's reading—which treats $100,000 as an aggregate ceiling applicable to all Professional Fees—would collapse those two separate clauses into one and render the first category largely meaningless. Given that New York law prohibits courts from interpreting a contractual provision that "renders [any] portion of [the contract] meaningless," the Court finds the DIP Lender's reading inconsistent with the text and structure of the DIP Agreement. *Wallace*, 618 N.Y.S.2d at 301.

The DIP Lender's position is also inconsistent with the provisions governing delivery of Trigger Notices. Even assuming an Event of Default had occurred, the DIP Agreement does not provide that the Post Carve-Out Cap becomes effective automatically upon default. Rather, section 3(e) provides that a Trigger Notice "may be delivered" only "on and during the continuation of an Event of Default" and in connection with termination of the DIP Lender's funding commitment. (DIP Agreement § 3(e)). Section 3(d), in turn, makes the $100,000 limitation applicable only to Professional Fees incurred "after the first business day following delivery of the Trigger Notice." (*Id*. § 3(d)). Thus, an Event of Default creates the contractual predicate for delivery of a Trigger Notice; it does not itself invoke the Post Carve-Out Cap. The DIP Agreement expressly separates the default from the notice that invokes the cap.

Thus, before the $100,000 Post Carve-Out Cap could even potentially limit subsequently-incurred Professional Fees, the DIP Lender must deliver a Trigger Notice satisfying the DIP Agreement's express requirements. The DIP Agreement defines a "Trigger Notice" as a written notice "that the DIP Lender is invoking the Post Carve-Out Cap," and section 3(e) requires that such notice "expressly state that the Post Carve-Out Cap has been invoked." (DIP Agreement §§ 1(j), 3(e)). Those requirements make clear that invocation of the cap requires an affirmative act by the DIP Lender beyond merely declaring an Event of Default.

Here, the record does not establish that the DIP Lender delivered a Trigger Notice satisfying those requirements. The DIP Lender's June 30, 2026 notice declared purported defaults, purported to terminate the DIP Lender's commitment to make additional Advances, and demanded return of the funds in the Lockbox Account. But the notice did not state that the Post Carve-Out Cap was invoked. (*See* June 30, 2026 Notice, Dkt. No. 141, at 55-56). Nor does the record establish that the May 27, 2026 notice satisfied that requirement. C&D represents that the May 27, 2026 notice

"makes no reference" to a Trigger Notice or otherwise invokes the Post Carve-Out Cap. (*See* Reply, Dkt. No. 143, at 6). The DIP Lender itself characterizes the May 27, 2026 communication as a "written notice of default," not as a Trigger Notice invoking the Post Carve-Out Cap. (*See* Objection, Dkt. No. 139, ¶ 25). Thus, although the DIP Lender purported to declare an Event of Default, the record does not establish that it separately invoked the Post Carve-Out Cap in the manner required by sections 1(j) and 3(e) of the DIP Agreement. The Court therefore finds that the DIP Lender has not established that the Post Carve-Out Cap became operative.

Even assuming, *arguendo*, that the May 27, 2026 email constituted a valid Trigger Notice, the result would be the same. The Application seeks only $63,085.50 in fees and $2,309.41 in expenses for the interim period from May 1, 2026 through June 30, 2026—a total of $65,394.91. (*See* Application, Dkt. No. 131, at 2, 6, 10). Because any Professional Fees that could have been incurred after a May 27, 2026 Trigger Date necessarily fall within that $65,394.91 amount, the maximum possible amount of post-Trigger Professional Fees is less than the $100,000 Post Carve-Out Cap. All fees incurred before that point fall within section 3(d)(iii) of the DIP Agreement without regard to the $100,000 cap. Thus, whether or not the May 27, 2026 email is treated as a valid Trigger Notice, the entire $525,906.16 in final fees and expenses requested by C&D falls within the definition of the Carve-Out.

To the extent the DIP Lender claims that any compensation would be subject to a "pro rata" limitation, the Court finds that argument unavailing on the present record. Section 3(d) contains no language establishing the pro rata allocation asserted by the DIP Lender. (*See* DIP Agreement § 3(d)). Rather, it protects all pre-Trigger Professional Fees and imposes an aggregate $100,000 limitation only on Professional Fees incurred after the first business day following delivery of the

Trigger Notice. (*Id.*). The "pro rata share" limitation appears only in the Objection, not in the DIP Agreement. (*See* Objection, Dkt. No. 139, ¶¶ 48-50).

**B. An Event of Default Does Not Eliminate the Carve-Out**

The DIP Lender next argues that, even if C&D's fees and expenses otherwise fall within the Carve-Out, the DIP Lender's obligation to fund C&D's fees and expenses terminated upon an Event of Default. (*See* Objection, Dkt. No. 139, ¶¶ 28, 31, 34, 37). That argument, however, conflates the DIP Lender's obligation to make future Advances with the separate protections afforded to Professional Fees under sections 3(d) through 3(f) of the DIP Agreement.

Sections 4(b) and 4(c) of the DIP Agreement condition ordinary Advances and Disbursements on, among other things, the absence of an uncured Event of Default. (*See* DIP Agreement §§ 4(b), 4(c)). But sections 3(d) through 3(f) expressly contemplate operation of the Carve-Out after default. (*Id.* §§ 3(d)-(f)). A Trigger Notice may be delivered only "on and during the continuation of an Event of Default." (*Id.* § 3(e)). Upon delivery of such notice, "notwithstanding anything to the contrary in the DIP Documents," the DIP Lender's liens, claims, and other rights remain "subject and subordinate to the Carve-Out until all expenses allowed thereunder are repaid in full." (*Id.*). The DIP Agreement thus treats an Event of Default as the circumstance that permits the DIP Lender to invoke the $100,000 Post Carve-Out Cap on Professional Fees incurred thereafter—not as an event that extinguishes the Carve-Out itself. (*Id.*). Reading an Event of Default to eliminate the Carve-Out would produce the anomalous result that the same event that permits the DIP Lender to invoke the Post Carve-Out Cap simultaneously eliminates the Professional Fee protection to which that cap applies. Nothing in sections 3(d) through 3(f) supports that reading.

A plain reading of section 3(f) also reveals that the Carve-Out Reserve survives an Event of Default. At the outset of the financing, the DIP Lender was required—"without the need of an Advance Request"—to fund $125,000 into the Lockbox Account as the Carve-Out Reserve "for the sole benefit of funding the Carve-Out." (DIP Agreement § 3(f)). The DIP Agreement then states that the DIP Lender's liens and claims "shall not attach" to that reserve and that the DIP Lender "shall have no recourse" to it "unless and until all allowed Carve-Out expenses have been fully paid." (*Id.*). Nothing in that language makes the protection contingent upon the absence of a default. To the contrary, section 3(f) expressly insulates the Reserve from the DIP Lender's post-default remedies until allowed Carve-Out expenses have been paid. (*Id.*).

### C. The DIP Lender Did Not Establish a Valid Basis to Terminate Its Funding Obligations

Having found that C&D's requested fees and expenses fall within the DIP Agreement's Carve-Out, the Court must separately determine whether the DIP Lender validly terminated its obligation to fund the remaining availability under the DIP Facility. Based on the record, the Court concludes that the DIP Lender has not established a valid basis for terminating its funding obligations under the DIP Agreement.

Before addressing the asserted Events of Default individually, the Court notes an important feature of the parties' relationship. In approving the DIP Facility, this Court previously found that the DIP Lender is an insider of the Debtor and that the relationship between the two entities is "unusually close," given the substantial overlap in their ownership and management. (*See* DIP Order, Dkt. No. 63, at 12-14). The DIP Lender's members consist "exclusively [of] Debtor shareholders" who collectively own "roughly 25.6% of the Debtor," and the record reflects substantial overlap among persons involved in the affairs of the Debtor, the funding of the DIP Facility, and the negotiation of the DIP Agreement. (*Id.* at 12; *see also* Dkt. No. 54, ¶ 7; Dkt. No.

47). The Court further found that the overlapping negotiators and protective-default provisions demonstrated that the DIP Loan was not negotiated at arm's length. (*See* DIP Order, Dkt. No. 63, at 14). *See In re SPAC Recovery Co*., 676 B.R. 260, 273 (Bankr. S.D.N.Y. 2026) ("These facts—coupled with overlapping negotiators on both sides and the existence of a protective-default provision—indicate that the DIP Loan was not negotiated at arm's length.").

The Court's prior finding is relevant here because the DIP Lender now alleges defaults by the Debtor as grounds for terminating the DIP Lender's contractual obligations under the DIP Agreement. The DIP Agreement places numerous obligations and conditions on the Debtor while conferring substantial remedies upon the DIP Lender upon the occurrence of specified Events of Default. (*See* DIP Agreement §§ 4, 7-8). While the DIP Lender's insider status does not itself alter the governing principles of contract interpretation where, as here, the parties do not dispute the validity of the DIP Agreement and its terms plainly govern the present dispute, the DIP Lender's insider status is nonetheless relevant to the Court's scrutiny of the factual circumstances upon which the DIP Lender relies. *See Pan Am Corp. v. Delta Air Lines, Inc*., 175 B.R. 438, 499-500 (S.D.N.Y. 1994) ("Where the allegedly inequitable conduct was committed by an 'insider' of the debtor, the conduct will be 'rigorously scrutinized' by the courts."); *see also In re Fabricators, Inc*., 926 F.2d 1458, 1465 (5th Cir. 1991) (explaining that insider transactions warrant close scrutiny because insiders "have greater opportunities for inequitable conduct, not because the relationship itself is somehow a ground for" the legal relief sought). Thus, the Court must examine whether the contractual predicates for the remedies asserted by the DIP Lender actually occurred, rather than simply accepting the DIP Lender's characterization of those events. Under New York law, where parties expressly condition contractual rights or obligations on the occurrence of specified events, those contractual predicates must be satisfied according to their terms. *See*

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690-91 (N.Y. 1995) (explaining that a contractual condition is an "act or event" that "must occur" before the corresponding contractual obligation arises and that express conditions must be literally performed); *see also MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (N.Y. 2009) ("Express conditions must be literally performed; substantial performance will not suffice.").

The DIP Lender's May 27, 2026 notice identified three purported defaults as grounds for denying funding. The first purported default was that the Debtor had improperly paid $145,000 to C&D on account of prepetition obligations; the DIP Lender relied upon section 7(a)(xi) for that purported default. Section 7(a)(xi) treats as an Event of Default certain material payments by the DIP Borrower on prepetition obligations. However, the payment identified by the DIP Lender—$145,000 paid to C&D on account of prepetition invoices—occurred before the commencement of this Chapter 11 case and before execution of the DIP Agreement. (*See* C&D Supplemental Statement, Dkt. No. 141, Ex. 1, at 1). Indeed, the DIP Lender itself acknowledges those payments to C&D occurred prepetition. (*See* Objection, Dkt. No. 139, ¶¶ 1, 5).

A plain reading of section 7 forecloses treating that prepetition payment as an Event of Default. Section 7(a) provides that "[o]nce this DIP Agreement becomes effective," the specified events "occurring after any applicable notice or grace period shall constitute an 'Event of Default.'" (*See* DIP Agreement § 7(a)). A payment occurring before the DIP Agreement became effective cannot constitute an Event of Default under section 7(a)(xi). That conclusion follows from the DIP Agreement itself and from the general principle that contractual liability cannot arise from conduct occurring before the contract became binding. *See Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001) (explaining that parties "cannot be held liable for breach of contract" for events that occurred before the agreement becomes binding).

The DIP Lender's second asserted default is that the Debtor's exclusive period to file a Chapter 11 plan had expired without the DIP Lender's consent, which relied upon section 7(a)(xii). That provision requires that "[a]n order is entered" terminating or modifying the Debtor's exclusive right to file a Chapter 11 plan without the DIP Lender's consent. (DIP Agreement § 7(a)(xii)). No such order had been entered on May 27, 2026. C&D had filed the Debtor's plan within the exclusivity period and a motion seeking a further extension was pending. (*See* C&D Supplemental Statement, Dkt. No. 141, Ex. 1 at 1). Whatever uncertainty surrounded the Debtor's future ability to maintain exclusivity, the contractual event specified in section 7(a)(xii)—entry of an order terminating or modifying that right—had not occurred.

The third asserted ground was an alleged anticipatory breach based upon the Debtor's May 21, 2026 email. That email stated that, if C&D withdrew, the Debtor would "likely not be able to confirm a Chapter 11 Plan" and would "likely" face dismissal or conversion. (C&D Supplemental Statement, Dkt. No. 141, Ex. 1 at 1-2). But the same email expressly advised the DIP Lender that "the DIP Borrower will be submitting" an Advance Request for $180,000 under the DIP Agreement. (*Id.*). A statement that future performance may become impossible if a specified contingency occurs is not a "positive and unequivocal" refusal to perform. *See Princes Point LLC v. Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (N.Y. 2017) (quoting *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150 (N.Y. 1978)) (explaining that, under New York law, an anticipatory repudiation requires the repudiating party to express an intent not to perform that is "positive and unequivocal"). To the contrary, the Debtor's express statement that it intended to invoke the contractual Advance Request procedure demonstrates an intent to perform under the DIP Agreement, not an unequivocal refusal to do so. (*See* C&D Supplemental Statement, Dkt. No. 141, Ex. 1 at 1-2).

The Court is similarly unpersuaded by the DIP Lender's reliance on the timing of the formal Advance and Disbursement Requests. The record reflects that, on May 21, 2026, the Debtor advised the DIP Lender that it intended to submit the required requests to pay C&D's allowed fees. Before those forms were submitted, however, the DIP Lender advised the Debtor on May 27, 2026, that it would deny the contemplated requests and refuse to fund further amounts under the DIP Agreement. The Debtor thereafter submitted the formal Advance and Disbursement Requests on June 26, 2026. (*See* C&D Supplemental Statement, Dkt. No. 141, ¶¶ 4-6). A party may not announce in advance that it will refuse performance and then rely upon the counterparty's failure to complete a contractual condition as the basis for that refusal. *See Kooleraire*, 28 N.Y.2d at 106; *see also Yoon v. Fordham Univ. Fac. & Admin. Ret. Plan*, No. 99-CV-11042-RCC, 2004 WL 3019500, at *15 (S.D.N.Y. Dec. 29, 2004) (citing *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989)) (explaining the "familiar principle that a party may not rely upon the failure to satisfy a contractual condition where the party itself caused the failure").

The DIP Lender's subsequent June 30, 2026 notice does not cure these defects. That notice asserted additional Events of Default under sections 7(a)(iii), 7(a)(iv), 7(a)(ix), and 7(a)(xiii)(C), and again relied upon section 7(a)(xii). (*See* June 30, 2026 Notice, Dkt. No. 141, at 55-56). For example, the DIP Lender asserted a default under section 7(a)(iii) because "no plan, approved or otherwise, can be confirmed" and under section 7(a)(iv) because the Court had "indicated on the record that it will enter an order dismissing" the case. (*Id*. at 55). But section 7(a)(iii) identifies confirmation of a plan other than an Approved Plan as the triggering event, while section 7(a)(iv) requires entry of an order dismissing or converting the case. A prediction that confirmation cannot occur and an indication that an order may later be entered are not the contractual events specified by those provisions.

More fundamentally, the June 30, 2026 notice could not immediately terminate the DIP Lender's obligations based upon newly asserted defaults. Section 8 provides that, "[u]pon the occurrence of any Event of Default," the DIP Lender must provide notice and may exercise its termination remedies only "[i]f the DIP Borrower fails to cure any such Event of Default within seven (7) business days" after receipt of that notice. (DIP Agreement § 8). Yet the June 30, 2026 notice simultaneously asserted the additional defaults and purported to "terminate[] its commitment to provide further advances or to approve further disbursements." (June 30, 2026 Notice, Dkt. No. 141, at 55). To the extent the notice relied on grounds not previously identified on May 27, 2026, the seven-business-day cure period had not elapsed when the DIP Lender purported to terminate the facility. Those newly asserted grounds therefore could not supply an independent basis for refusing the June 26 funding requests. Section 8 expressly conditions the lender's termination remedy on notice plus expiration of a seven-business-day cure period.

Accordingly, neither the May 27, 2026 notice nor the June 30, 2026 notice established a contractual basis for refusing to fund the June 26, 2026 requests or for terminating the DIP Lender's remaining funding obligations under the DIP Facility.

**D. The DIP Lender Must Fulfill Its Funding Obligations**

The final question is whether the Court has authority to enforce the DIP Lender's funding obligations under the Court-approved DIP Agreement. The Court concludes that it has authority to do so under § 105(a).

Section 105(a) provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code and expressly recognizes the Court's authority to take action "necessary or appropriate to enforce or implement court orders." 11 U.S.C. § 105(a). Courts in the Second Circuit have recognized that, although §

105(a) does not permit a bankruptcy court to create substantive rights unavailable under applicable law, it "plainly may be used 'to enforce and implement' earlier orders." *River Center*, 394 B.R. at 711; *see also In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010) (holding that § 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity") (internal quotations omitted). Indeed, *River Center* specifically recognized that § 105(a) permits a bankruptcy court to enforce both its earlier orders and agreements previously approved by the court. *See River Center*, 394 B.R. at 711-12.

That principle extends to the enforcement of a post-petition financing arrangement approved under § 364. Courts have routinely recognized that DIP financing orders entered under § 364 incorporate and implement the parties' financing agreements, and when disputes later arise concerning performance under those financing orders, ordinary contractual principles govern their enforcement. *See, e.g., In re Motors Liquidation Co.*, 460 B.R. 603, 620 (Bankr. S.D.N.Y. 2011) (describing a financing order as "implementing arrangements that are contractual" and explaining that the court construed the order "very much as [the court would] construe a contract"); *In re Pan Am Corp.*, 162 B.R. 667, 669 (S.D.N.Y. 1993) (explaining that each DIP order authorized borrowing pursuant to the parties' loan agreement and that "each approved the terms of the Loan Agreement"); *KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 228 (S.D.N.Y. 2019) (recognizing that a dispute concerning a post-petition DIP agreement may require interpretation of the corresponding DIP orders and that such orders "authorized the agreements at issue"); *In re Arlington Hosp., Inc.*, 368 B.R. 702, 720 (Bankr. N.D. Ill. 2007) (explaining that "[f]inancing orders under section 364 approve financing agreements" and, in enforcing those orders, "contractual principles apply").

In *Korea Chosun*, for example, the bankruptcy court directed payment of fees provided for by a court-approved post-petition financing order after determining that the contractual predicate for payment had occurred. *See Korea Chosun*, 337 B.R. at 783-85. There, the DIP financing order provided that the lender was entitled to a commitment fee and reimbursement of expenses if the financing failed to close "through no fault" of the lender. *Id*. After determining that the lender was not at fault, the court held that, "pursuant to the terms of the DIP Order," the lender was entitled to payment. *Id*. at 783. In reaching that conclusion, the *Korea Chosun* court expressly considered § 105(a) together with the DIP financing order, recognizing that § 105(a) authorized the court to issue orders necessary or appropriate to carry out the Bankruptcy Code while looking to the DIP financing order itself to determine the lender's substantive entitlement. *Id*. Like *Korea Chosun*, this case does not require the Court to create a new substantive right under § 105(a); it requires only that the Court enforce the funding obligations established by the DIP Agreement and approved by the DIP Order.

While the Court's equitable powers under § 105(a) are broad, that provision does not confer "a roving commission to do equity" or permit a bankruptcy court to override substantive rights established elsewhere in the Bankruptcy Code. *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)); *see also Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216 n.2 (2024) (explaining that "§ 105(a) alone cannot justify the imposition of nonconsensual third-party releases because it serves only to 'carry out' authorities expressly conferred elsewhere in the [C]ode") (internal citations omitted); *Law v. Siegel*, 571 U.S. 415, 421 (2014) (holding that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code," and explaining that "whatever equitable powers remain in the bankruptcy courts must and can only be

exercised within the confines of" the Code). But no such concern is implicated here. The Court is not modifying the DIP Agreement, enlarging the DIP Facility, or creating a new substantive obligation running from the DIP Lender to C&D. Instead, the Court is enforcing the very financing arrangement that the DIP Lender negotiated and that this Court approved under § 364. (*See* DIP Order, Dkt. No. 63). The DIP Lender received the benefits of the DIP Order—including priming liens, superpriority treatment, and contractual default remedies—and remains bound by the corresponding obligations imposed by the same Order and Agreement.

The DIP Agreement expressly authorizes payment of Professional Fees as a permissible use of DIP proceeds, requires the DIP Lender not to unreasonably deny a compliant funding request, protects Professional Fees through the Carve-Out, and insulates the Carve-Out Reserve from the DIP Lender's liens and recourse until allowed Carve-Out expenses have been paid. (*See* DIP Agreement §§ 2(b), 2(c)(iv), 2(d)(iv), 3(d)-(f)). Having concluded that C&D's allowed compensation falls within those protections and that the DIP Lender did not validly terminate its remaining funding obligation, the Court finds that directing the DIP Lender to perform those obligations merely enforces the DIP Order and does not alter the parties' substantive rights under the DIP Agreement.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that C&D's requested fees and expenses, as allowed by the Fee App Order (Dkt. No. 146), fall within the Carve-Out under the DIP Agreement. The Court further finds that the DIP Lender has not established that the $100,000 Post Carve-Out Cap became operative; that an Event of Default does not extinguish the protections afforded by the Carve-Out; and that the DIP Lender did not establish a valid basis for terminating its remaining funding obligations under the DIP Agreement.

Accordingly, pursuant to § 105(a) and the DIP Order, the Court hereby directs the DIP Lender to fulfill its funding obligations under the DIP Agreement and to cause the available DIP Facility proceeds, including funds protected by the Carve-Out Reserve, to be disbursed toward the payment of C&D's unpaid fees and expenses. *See* DIP Agreement § 2(d)(v) (providing that the DIP Lender shall "cause" an approved amount to be disbursed from the Lockbox Account, including directly to the firm to which the fees and expenses are owed).

**IT IS SO ORDERED.**

Dated: September 17, 2026
New York, New York

/s/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE